**Patrick LYNCH, in his capacity as Attorney General**

v.

**Patrick CONLEY.**

**No. 2003–100–Appeal.**

Supreme Court of Rhode Island.

June 17, 2004.

Joseph R. Gaetta, II, Esq., for Plaintiff.

Anthony DeCisto, Esq., for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

### OPINION

GOLDBERG, Justice.

The plaintiff in this action, Patrick Lynch, in his capacity as Attorney General for the State of Rhode Island (plaintiff or Attorney General),[1] appeals from a Superi-

---

1. Pursuant to Rule 25(d) of the Superior Court Rules of Civil Procedure, Patrick Lynch has been substituted for Sheldon Whitehouse.

or Court judgment denying his petition to enforce a civil investigative demand (CID) issued pursuant to the Deceptive Trade Practices Act (DTPA or the act). The Superior Court dismissed the CID, concluding that the particular activity complained of—selling residential property without disclosing the existence of lead paint—was exempted from the DTPA, and that the Attorney General lacked jurisdiction to prosecute such conduct as a deceptive trade practice. Discerning no error, we affirm the judgment of the Superior Court.

## Facts and Travel

The facts of this case are not in dispute. The defendant, Patrick Conley (defendant or Conley), is an attorney who has engaged in the practice of buying residential properties at municipal tax auctions and subsequently reconveying the properties to their former owners, or selling them to third parties. Before September 2002, the Attorney General's office received a complaint that defendant had sold property without disclosing the existence of lead paint contamination in violation of G.L. 1956 § 23–24.6–16 of the Lead Poisoning Prevention Act and Rhode Island Department of Health Rules and Regulations for Lead Poisoning Prevention, R 23–24.6–PB § 9.

Pursuant to G.L.1956 § 6–13.1–7, on September 26, 2002, the Attorney General issued a CID to defendant seeking records for all residential properties he sold from 1994 to the date of the demand. The CID referred to the allegation that defendant had not complied with statutory or regulatory lead paint disclosure and notification requirements for the sale of real estate and demanded, *inter alia,* "all documents evidencing compliance with R.I. Gen. Laws § 23–24.6–16 and *DOH Rules and Regulations for Lead Poisoning Prevention,* R 23–24.6–PB § 9." On October 4, 2002, after defendant objected to the breadth of the information request, the Attorney General issued an amended CID that limited the demand to documents reflecting properties Conley sold from 1999 to the date of the demand.

The defendant appeared at the Attorney General's office and produced records from a single residential property sale—the transaction that was the subject of the complaint that gave rise to the CID—but refused to provide documentation of other real estate transactions. Conley confessed ignorance of the lead paint notification and disclosure requirements and admitted that he had failed to comply with both state and federal regulations during past transactions, but represented that he would comply with the lead paint notification requirements in all future transactions. However, he steadfastly refused to provide additional material that the CID requested.

On November 18, 2002, the Attorney General filed a petition to enforce the CID (petition) as authorized by § 6–13.1–7(f). The petition sought a Superior Court order directing defendant to comply with the CID and produce the relevant real estate records, and an injunction restraining defendant from engaging in the "advertising or sale of any merchandise or the conduct of any trade or commerce that is involved in the violation alleged in the [CID]." On November 26, 2002, defendant filed an objection to the petition, and moved to dismiss the CID.

A hearing was held on December 6, 2002, and the hearing justice, citing this Court's previous pronouncements relative to the DTPA, ruled that the act contained a statutory exemption that excluded from its purview those activities that are the subject of comprehensive state or federal regulation. In this instance, the hearing justice found that the "entire [lead paint] scheme is under the aegis of the Department of Health, and, therefore, the exemp-

tion applies." An order dismissing the CID was entered on February 11, 2003. The Attorney General has appealed.

## Discussion

The DTPA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce * * *." Section 6–13.1–2. Sections 6–13.1–5 and 6–13.1–7 of the act vest the Attorney General with the authority to investigate and prosecute any person whom the Attorney General has reason to believe may be involved in any prohibited activity. However, when the challenged activity is otherwise subject to government regulation, the DTPA is unavailing. Specifically, § 6–13.1–4 provides: "Nothing in this chapter shall apply to actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States."

This Court established the analytical framework for this exception in *State v. Piedmont Funding Corp.*, 119 R.I. 695, 382 A.2d 819 (1978). In *Piedmont Funding Corp.*, the Attorney General brought an action under the DTPA alleging that the defendant, who had engaged in selling insurance and mutual funds, employed deceptive practices. The defendant moved to dismiss, asserting that the activity complained of—selling insurance and securities—was regulated by governmental agencies and therefore exempted from the DTPA. In applying § 6–13.1–4, we held that the plain language "clearly exempted from the [DTPA] all those activities and businesses which are subject to monitoring by state or federal regulatory bodies or officers." *Piedmont Funding Corp.*, 119 R.I. at 699, 382 A.2d at 822. We noted that the sale of insurance policies and securities was regulated by the State of Rhode Island, Department of Business Regulation, and the federal government under statutes that specifically prohibited the use of deceptive practices. G.L.1956 § 27–29–4; G.L.1956 § 7–11–501. *See also Piedmont Funding Corp.*, 119 R.I. at 699–700, 382 A.2d at 822. The sale of securities in Rhode Island is permitted only when such sales are conducted in accordance with chapter 11 of title 7, entitled "The Rhode Island Uniform Securities Act," and interstate sales of securities are allowed only under federal rules and regulations generally governed by the Securities and Exchange Commission. *Piedmont Funding Corp.*, 119 R.I. at 699–700, 382 A.2d at 822. Accordingly, a license to sell these instruments in Rhode Island subjected the seller to monitoring by a state or federal regulatory agency or authority. *Id.* "Therefore, * * * because the conduct at issue was clearly subject to the control of governmental agencies * * * it is within the exemption provision and not subject to the mandates of the [DTPA]." *Id.* at 700, 382 A.2d at 822.

■ Thus, step one of the exemption analysis requires the party claiming the exemption to demonstrate that the general activities complained of are subject to monitoring or regulation by a state or federal government agency. If a court determines that the activities are so regulated, the burden shifts to the party seeking to enforce the DTPA to establish that "the specific acts at issue are not covered by the exemption." *Id.* We held in *Piedmont Funding*, that because the sale of insurance and mutual funds was regulated by government agencies, and failure to comply with such regulation would result in revocation of the necessary licenses, the state had "not met its burden of showing that the specific actions or transactions involved do not fall within the statutory exemption." *Id.*

We recently have reaffirmed *Piedmont Funding's* two step analytical framework. In *Chavers v. Fleet Bank (RI), N.A.,* 844

A.2d 666 (R.I.2004), the defendant bank advertised a fixed interest rate to individuals who opened credit card accounts with the bank. When the bank subsequently increased these "fixed" rates, the plaintiff attempted to hold them liable under the DTPA. In applying the exemption, we noted that "credit card solicitations by a national bank * * * are subject to monitoring, supervision and regulation by federal agencies" and therefore are within DTPA's statutory exemption. *Id.* at 672. Moreover, we concluded that the plaintiffs had failed to show that the challenged activity, deceptive credit card solicitations, was not subject to the federal government's regulatory authority. *Id.* at 672–75. Accordingly, we held that the exemption applied and the DTPA claim failed.

In this case, the Attorney General essentially asks us to abrogate *Piedmont Funding's* oft-reiterated holding that § 6–13.1–4's plain language "clearly exempted from the [DTPA] all those activities and businesses which are subject to monitoring by state or federal regulatory bodies or officers." *See, e.g., Chavers,* 844 A.2d at 670; *Kondracky v. Crystal Restoration, Inc.,* 791 A.2d 482, 484 (R.I.2002) (mem.); *Kelley v. Cowesett Hills Associates,* 768 A.2d 425, 432 (R.I.2001) (per curiam); *Doyle v. Chihoski,* 443 A.2d 1243, 1244 (R.I.1982) (per curiam); *Perron v. Treasurer of Woonsocket,* 121 R.I. 781, 785, 403 A.2d 252, 254 (1979). The Attorney General argues that the exemption ought not apply to this situation because the language of the section exempts only conduct "permitted" under laws administered by a governmental agency, and that no such permission or licensure was required here. He contends that our jurisprudence erroneously has expanded upon the statutory language by ruling that the exemption applied to all activities subject to monitoring by governmental agencies, not simply activities permitted under state or federal law.

We decline the invitation to overturn *Piedmont Funding* and its progeny. Our holdings on this issue have been uniform for more than twenty-five years, and we discern no reason to rule otherwise. Accordingly, consistent with the doctrine of *stare decisis,* we adhere to the analytical framework developed through our jurisprudence. Any argument in favor of amending the breadth and scope of the DTPA exemption should be made to the General Assembly and not this Court.

■ We are satisfied that the DTPA's statutory exemption applies in this instance. Lead paint disclosure in connection with the sale of residential real estate, already is comprehensively regulated by the state and federal government. The General Assembly enacted the Lead Poisoning Prevention Act in 1991 to combat the emerging problem of environmental exposure to lead paint. In so doing, the Legislature said that its purpose was "to protect the public health and public interest by establishing a *comprehensive* program to reduce exposure to environmental lead * * *." Section 23–24.6–3. (Emphasis added.) To achieve this objective, the General Assembly directed the Department of Health to promulgate regulations governing the disclosure of "lead exposure hazards and potential lead exposure hazards in a residential dwelling, dwelling unit, or premise that is offered for sale or lease." At a minimum, these regulations were intended to incorporate the requirements of the Federal Residential Lead–Based Paint Hazard Reduction Act, codified at 42 U.S.C. § 4852d. *See also* § 23–24.6–16(a).

Pursuant to the General Assembly's mandate, the Department of Health issued regulations at R 23–24.6–PB § 9 requiring sellers, lessors, and agents of residential real property to provide specific information and make certain disclosures to the

purchaser of the residential property. A seller is required to provide the purchaser of residential property with an EPA educational pamphlet, disclose any known information concerning the presence of lead exposure hazards in the property, provide any lead hazard inspections reports, incorporate a Lead Warning Statement into the sale contract, and, in certain instances, permit the purchaser ten days to inspect the property for lead exposure hazards before the purchaser becomes obligated under any purchase and sale agreement. *Id.* at § 9.2(a)-(d). Importantly, the Department of Health has enforcement authority under the regulations, and can fine sellers up to $500 per violation of these regulations. *Id.* at § 9.5(a).

Here, the Attorney General is seeking to declare unlawful Conley's conduct in conveying residential real estate without proper lead hazard disclosures; activity that is regulated and monitored by the Department of Health. By its own terms, the CID alleges that the deceptive practice under investigation is defendant's "[failure] to provide the purchaser of a residential property notification and/or disclosure of lead paint as required by R.I. Gen. Laws § 23–24.6–16 and * * * R 23–24.6–PB § 9." Accordingly, the Attorney General is unable to demonstrate that the allegedly deceptive conduct is not subject to government regulation, and the exemption applies.

This case is similar to *Kelley*, 768 A.2d at 431–32, in which the plaintiff pursued a deceptive trade practice allegation because her apartment floor was contaminated with asbestos. We held that the plaintiff was not entitled to a remedy under the DTPA because the removal of asbestos was governed by the Asbestos Abatement Act, G.L.1956 chapter 24.5 of title 23, and therefore exempt from the DTPA's purview. *Kelley*, 768 A.2d at 432. Like the Lead Poisoning Prevention Act, the Asbes-tos Abatement Act designates the Department of Health as the state agency responsible for enforcing the statute, and the Department of Health has promulgated regulations to aid in its enforcement. *See generally* R 23–24.5–ASB.

In the alternative, plaintiff argues that the state regulation concerning lead paint should be distinguished from the regulation at issue in *Piedmont Funding* and *Kelley* because § 23–24.6–25 of the Lead Poisoning Prevention Act contains a construction clause expressly preserving other remedies at law for practices encompassed by its terms, while the statutory schemes in our previous cases contained no such provision. The savings clause provides "[t]he provisions of this chapter shall be liberally construed and shall be held to be in addition to, and not in substitution for or a limitation of, the provisions of any other law." The plaintiff contends that this savings clause prevents us from construing the Lead Poisoning Prevention Act or the regulations promulgated thereunder as limiting the right of the Attorney General to pursue a remedy under the DTPA. We disagree. The sale of residential property in violation of the Lead Poisoning Prevention Act is prohibited conduct and is explicitly regulated by the Department of Health. The CID at issue in this case specifically was grounded on a violation of the Lead Poisoning Prevention Act and not on "the provisions of any other law." Thus, the savings clause is of no moment to this appeal.

### Conclusion

The decision of the Superior Court is affirmed. The papers in this case are remanded to the Superior Court.

Justice FLAHERTY did not participate.